WILLIAM H. DRAKE, respondent,

*v.*

LILLIAN K. MANN, appellant.

[Submitted December 7th, 1912. Decided March 3d, 1913.]

The complainant, an elderly man, within six weeks after a paralytic stroke which disabled one side of his body and affected his mind, executed an agreement promising to give defendant, an employe with whom he boarded, a certain amount in cash or a house in lieu thereof.—*Held,* under the evidence in the case that the defendant had not met the burden which was cast upon her of showing that the donor understood the nature of the act, and that it was not done through the undue influence of the donee.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell.

*Mr. James Fisher* and *Mr. Joseph M. Roseberry,* for the respondent.

*Mr. Frank E. Bradner,* for the appellant.

The opinion of the court was delivered by

TREACY, J.

The complainant has been for about twenty years in the business and manufacture and installation of steam and hot water heaters. His factory was in Hackettstown in this state and he had an office in Newark. He appears to have looked after the office himself, leaving the factory in charge of his wife. The defendant was employed by him in 1893 as a stenographer and bookkeeper in the Newark office. She was then and is now residing with her mother in East Orange, and the complainant took up his residence with them practically as a member of the family at about the same time that defendant entered his em-

ployment and lived with them until some time after the agreement, which is the cause of the controversy in this action, was executed. That agreement was made November 14th, 1908. It recites that the defendant was in complainant's employ for more than thirteen years, during which time she rendered services for which she had not been fully compensated, and in view of the illness of the complainant which would prevent his giving his attention to the business and require additional labor and responsibility, it is provided, *first,* that complainant shall pay defendant a sum of money in cash or convey to her certain property in Newark, the payment or the transfer to be made after the expiration of one year after the business carried on by the complainant shall be discontinued or one year after his decease; and *second,* that the defendant will remain in said employ so long as she is able to do so and shall receive the salary she was then receiving and an additional compensation consisting of a percentage of the profits, which percentage should be paid also at the expiration of one year after the discontinuance of the business or the death of the complainant. The bill attacks the agreement upon the ground that at the time it was executed the complainant was incapacitated by disease from properly comprehending the nature of the transaction and that defendant taking advantage of his weak mental and physical condition procured his signature to it.

The complainant, a man between sixty-five and seventy years of age, had a stroke of apoplexy on October 6th, 1908, which affected his left side. He was taken to his boarding-house in East Orange, the house of defendant and her mother, and remained there till late in December following. His wife came from Hackettstown to take care of him and returned at the end of each week to that place, spending Saturdays in Hackettstown at the factory. On November 14th, 1908, the agreement in question was executed. It was on a Saturday, and the wife of the complainant in accordance with her custom had gone to Hackettstown, leaving the complainant in the charge of defendant and her mother, father and another relative of defendant. The defendant had been paid her salary regularly while in the employ of the complainant, beginning with $13 a week and increasing from

time to time until it was $20 a week at the time of the execution of the agreement. She used to go to lunch almost daily with the defendant and had been in New York and Boston with him. The attorney who drew the agreement, a reputable lawyer, testifies that the defendant saw him a day or two before it was signed and gave him the substance of it, telephoned him when to come to have it signed by the complainant and paid him for his services. A doctor who had known complainant twenty years and saw him about the time that he was removed from the house of defendant and her mother about two and a half months after the stroke, and talked with him frequently, and who attended him for several months before the commencement of the action, says he was totally paralyzed on the left side. He noticed a great change in his mental condition and that his talk was of a silly nature. He says the complainant had a complete hemiplegia and laughs and cries over the slightest thing although he was a man of stern and taciturn manner before his illness. He does not consider him competent to do business. This testimony, so far as it bears on the nature of the illness and incapacity of complainant to transact business, is fortified by that of another physician called on behalf of complainant. The superintendent of the factory at Hackettstown went to Newark to see him about two or three weeks after the stroke, and again seven or eight weeks afterwards and says his mind wandered when he tried to talk with him on business matters. Although the physician called on behalf of defendant testified on direct examination that he did not think the complainant's mind was affected by the stroke, he said on cross-examination that such a stroke as the complainant had would necessarily affect the brain to a certain extent.

The learned vice-chancellor determined among other things that upon the facts recited the burden of proof was shifted to the defendant and that she did not meet that burden. We agree with him. We think the complainant's mind was enfeebled by the paralytic stroke and he was so placed as to be likely to be subjected to the influence of the defendant. The familiarity of the relationship that existed between complainant and defendant, his serious illness, which necessarily affected his brain, and his

residing at the home of defendant and her mother where the surrounding influences were favorable to the making of the agreement, gave to defendant a dominant position as between herself and complainant. She failed to support the burden that was cast upon her by reason of the relationship thus shown to exist. *Baur* v. *Cron, 71 N. J. Eq.* (*1 Buch.*) *743.* In *Haydock* v. *Haydock, 34 N. J. Eq.* (*7 Stew.*) *570,* this court, Mr. Justice Reed delivering the opinion, says (at *p. 574*) : "I take the rule to be settled that where a person enfeebled in mind by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee." The context shows that the "influence" spoken of is "undue" influence, *i. e.,* the substitution of the dominant will for that of the ostensible actor.

We think, therefore, that the decision of this case is governed by the rule stated in the *Haydock Case,* and that the decree below was right.

The decree is affirmed.

*For reversal*—None.